IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRICIA LEWIS, *et al.*, | ) | CASE NO. 1:11-cv-00644 |
| | ) | |
| Plaintiffs, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MYRON D. WHEATLEY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **REPORT AND RECOMMENDATION** |

### I.  Procedural Background

On March 2, 2011, Plaintiff Tricia Lewis and her minor children (hereinafter "Plaintiffs") filed a Complaint in the Ashtabula County Court of Common Pleas, alleging fifteen counts for relief against the various defendants.[1]  (ECF No. 1-1.)   Plaintiffs state that they participated in the Section 8 Housing Program and were tenants of a property at 5943 Runkle Avenue in the city of Ashtabula, Ohio.  (ECF No. 1-1 at ¶¶1, 32.)  Generally, Plaintiffs allege that they suffered

---

[1]  In addition to filing suit against the Ashtabula Metropolitan Housing Authority ("AMHA"), Plaintiffs also filed suit against Myron D. Wheatley, Deborah Wheatley, Paul Bunyan Enterprises, Inc., and Xanadu Properties LLC, whom Plaintiffs refer to collectively as the "Renting Defendants," as well as Kish Heating & Cooling, Inc., Harris Electric Heating & Cooling, and C&S Construction, Inc., whom Plaintiffs refer to collectively as the "Contractor Defendants."  (ECF No. 1-1 at ¶¶6, 10.)

injuries to their health due to the presence of mold and/or microbiological contaminants as a result of the acts or omissions of the defendants. (ECF No. 1-1.) On March 30, 2011, Defendant AMHA filed a Notice of Removal. (ECF No. 1.)

With respect to Defendant AMHA, Plaintiffs allege two causes of action: count fourteen, a civil rights action pursuant to 42 U.S.C. § 1983 claiming that AMHA failed to implement Housing Quality Standards required in the Code of Federal Regulations; and, count fifteen, a civil rights action pursuant to 42 U.S.C. § 1983 claiming that AMHA, acting under color of state law, created a danger to Plaintiffs. (ECF No. 1-1 at ¶¶160-71.) On April 26, 2011, AMHA filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 6.) On May 31, 2011, Plaintiffs filed a brief in opposition, to which AMHA replied on June 8, 2011. (ECF Nos. 12 & 13.)[2]

## II. Federal Civil Rule of Procedure 12(b)(6) Standard

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) "should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Well-pleaded allegations must be taken as true and construed most favorably toward the non-moving party. *See, e.g., Mayer v. Mylod*, 988 F.2d 635, 637 (6th Cir. 1993). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is

---

[2] On October 18, 2011, Nationwide Insurance Company of America, Nationwide Mutual Fire Insurance Company, and Nationwide Mutual Insurance Company filed a Motion to Intervene *Instanter* pursuant to Federal Rule of Civil Procedure 24. (ECF No. 15.) As the proposed complaint of the intervening companies do not name AMHA as an intervening defendant, the motion is immaterial to the disposition of AMHA's motion to dismiss.

inapplicable to legal conclusions[, as] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Although a court may not grant a Rule 12(b)(6) motion based on its disbelief of the factual allegations contained in the complaint, *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990), a court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  Consequently, a claim should not be dismissed unless it is unsupported by the law or the facts alleged are insufficient.

### III.  Factual Allegations

The Complaint contains the following relevant factual allegations.  Plaintiffs, as tenants of the Renting Defendants at a property located in Ashtabula, Ohio, were exposed to mold and/or other microbiological contaminants.  (ECF No. 1-1.)  Plaintiffs participated in the Section 8 Housing Program funded by the United States Department of Housing and Urban Development ("HUD") and administered by Defendant AMHA.  (ECF No. 1-1 at ¶¶32, 34-35.)  AMHA contracted with property owners to make rental subsidy payments pursuant to 24 C.F.R. § 982.1(a), (b).  *Id*. at ¶36.  Prospective tenants must approach a private landlord to determine their willingness to participate in Section 8 housing and thereafter request approval from the AMHA.  *Id*. at ¶40.  AMHA may only approve such a request where it has determined that the unit (1) is eligible, (2) has been inspected and found to comply with housing quality standards prescribed by HUD, (3) has a proposed lease including the tenancy addendum prescribed by HUD, and (4) has a reasonable rent.  *Id*. at ¶¶41, 55.  AMHA and the Renting Defendants executed a "HAP contract," the form of which is mandated by HUD.  *Id*. at ¶¶43-45.   The HAP

contract requires the owner of the rental property to maintain the property in accordance with HUD's housing quality standards. *Id*. at ¶52. Pursuant to § 1437f(o)(8)(D) of the Housing Act of 1937, AMHA must conduct inspections of a rental unit annually and at other times as needed to ensure it is maintained in accordance with HUD's housing quality standards. *Id*. at ¶¶56-59.

Plaintiffs aver that the property they rented was well below the minimum standards of safety required by HUD. (ECF No. 1-1 at ¶71.) They further assert that "improper inspections and repairs were made" to the property.[3] *Id*. at ¶72. Despite the property's failure to comply with applicable housing quality standards, AMHA entered into a contract with the owners for rental of the property. *Id*. at ¶73. None of the Defendants performed or required testing for microbiological contaminants or other pollutants known to arise from dampness. *Id*. at ¶80.

On an unspecified date, the Board of Health or the AMHA determined that the property was an unhealthy environment and required the Plaintiffs to relocate. (ECF No. 1-1 at ¶151.)

Plaintiffs assert that Defendant "AMHA's conduct as set forth above, acting under color of state law, was recklessly, willfully, and deliberately indifferent to [their] health, safety and well-being ... and was committed in conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm to members of the public and [Plaintiffs] and was so egregious as to shock their conscience." (ECF No. 1-1 at ¶161.) Plaintiffs claim that said conduct violated their Fifth and Fourteenth Amendment Rights, as well as the United States Housing Act of 1937 and the applicable portions of the Code of Federal Regulations. *Id*. at ¶162. Furthermore, they claim AMHA violated its own administrative plan and internal policies. *Id*. at ¶163.

Plaintiffs allege that a relationship existed between them and AMHA, and that they were

---

[3] Plaintiffs do not specify which party made improper inspections and repairs.

4

foreseeable victims. (ECF No. 1-1 at ¶27.) AMHA created a danger that left Plaintiffs more vulnerable than had the AMHA not acted at all, resulting in catastrophic and debilitating injuries. *Id*. at ¶¶169-170.

### IV. Law and Analysis

**A. Count Fourteen: *Monell* Claim**

In Count Fourteen of the Complaint, Plaintiffs allege that they suffered injuries to their health and assert a claim pursuant to 42 U.S.C. § 1983. Essentially, Plaintiffs allege that AMHA, through its employees and/or agents, did not comply with applicable housing quality standards (HQS) when they either failed to inspect or failed to properly inspect the rental property. (ECF No. 1-1.)

Pursuant to § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution and laws*, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..." (emphasis added). Section 1983, however, "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted) (*citing Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)); *see also Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979) ("[O]ne cannot go into court and claim a 'violation of § 1983' – for § 1983 by itself does not protect anyone against anything.") The threshold question is whether Plaintiffs have even alleged a violation of a cognizable federal right. *Id*. ("The first

5

step in any [§ 1983 claim] is to identify the specific constitutional right allegedly infringed.") (*citing Graham v. Connor*, 490 U.S. 386, 394 (1989)).

In Count Fourteen, Plaintiffs do not allege a violation of any right, privilege, or immunity other than the allegation that AMHA failed to comply with applicable housing quality standards (HQS) found in 24 C.F.R. § 982, *et seq*. promulgated in connection with 42 U.S.C. § 1437. (ECF No. 1-1 at ¶¶160-64.) The question, therefore, is whether these laws and regulations created any actionable rights, privileges, or immunities. (ECF No. 1-1.) Pursuant to 24 C.F.R. § 982.406 – entitled "Enforcement of HQS" – "Part 982 does ***not create any right of the family***, or any party other than HUD or the HA, to require enforcement of the HQS requirements by HUD or the HA, or to assert any claim against HUD or the HA, for damages, injunction or other relief, for alleged failure to enforce the HQS." (emphasis added). Thus, the very regulations Plaintiffs believe create a right, privilege, or immunity supporting their § 1983 action expressly disclaim the creation of that right. As explained in a recent decision of the United States District Court for Puerto Rico, federal courts addressing this issue have rejected the argument that the HQS establishes rights privately enforceable by tenants:

> Plaintiffs ardently advance that they have a private right of action to enforce the HQS and other benefits and privelges [sic] under Section 8 of the U.S. Housing Act of 1937, 42 U.S.C. §. 1437f, and the HUD regulations thereunder, §982.406 and §982.456(b)(2). Their arguments are unavailing and no Court in the land has held what Plaintiffs now advocate.
>
> Section 8 housing must comply with HQS that HUD prescribes. 42 U.S.C. § 1437f(o)(8) and 24 C.F.R. § 982.401. If a Section 8 landlord fails to maintain the unit in compliance with the HQS, the PHA is obligated to "take prompt and vigorous action to enforce the owner obligations." 24 C.F.R. § 982.404(a)(2). [Neither] [t]he statute nor the regulations nor any court has burdened a Section 8 tenant with this responsibility or bestowed a Section 8 tenant with this right.
>
> We join a long line of courts that have all determined that the Housing Act does

6

>not expressly grant a private right of action to individuals who are suing HUD over the poor quality of their Section 8 housing. *See* 42 U.S.C. § 1437f(o)(8); 24 C.F.R. § 982.401 *et seq*.; *Hill v. Richardson*, 7 F.3d 656, 658 (7th Cir. 1993) ("[Section] 1437f does not create a private right of action."); *Kirby v. Richmond Redevelopment & Housing Authority*, No. 04-0791 (REP) (MHL), 2005 U.S. Dist. LEXIS 43546, 2005 WL 5864797, at *7 (E.D.Va. Sept. 28, 2005), aff'd, 194 F. Appx. 105 (4th Cir. 2006) ("No express private right of action exists in [the Housing Act] or the regulations enabling a voucher participant to enforce the provisions."); *see Gilchrist v. Bakshi*, No. 09-0415, 2009 U.S. Dist. LEXIS 115614, 2009 WL 4909439, at *2-*3 (D.Md. Dec. 10, 2009), (holding that the Housing Act does not create a federal right of action against HUD for failing to enforce a landlord's compliance with the HQS); *Lindsay v. New York City Housing Authority*, No. 95-3315, 1999 U.S. Dist. LEXIS 1893, 1999 WL 104599, at *4 (E.D.N.Y. Feb. 24, 1999) (stating that 24 C.F.R. § 982.406 "unambiguously denies a private right of action"); *Green v. Konover Residential Corp.*, No. 95-1984, 1997 U.S. Dist. LEXIS 18893, 1997 WL 736528, at *8 (D. Conn. 1997) (finding that no private right of action exists under § 1437 "for failure to maintain the premises in a safe and sanitary condition," because Congress's intention was that "HUD should enforce the required conditions by asserting its rights under the HAP contracts, thereby foreclosing private enforcement of the requirements under the Housing Act").

*Reyes-Garay v. Integrand Assur. Co.*, 2011 U.S. Dist. LEXIS 118080, 38-39 (D.P.R. Sept. 30, 2011). Not only is the above decision persuasive, but it is also consistent with the law of the Sixth Circuit. In *Johnson v. City of Detroit*, 446 F.3d 614, 627 (6th Cir. 2006), the Court found that "[a]lthough residents of public housing undoubtedly 'benefit' from the statutory provisions at issue, the language of § 1437f has an aggregate focus on the entity being regulated, thereby belying any intent to create rights enforceable by individual tenants ... and, thus, does not give rise to an individual entitlement enforceable under § 1983." These decisions are also consistent with the United States Supreme Court's pronouncement that "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). Here, the federal regulations could not be any clearer – tenants may not assert claims for damages against HUD or the Housing Authority for alleged

failure to enforce the HQS.

Both parties also cite *McKinney v. Philadelphia Housing Authority*, 2010 U.S. Dist. LEXIS 60410 (E.D. Pa., June 16, 2010).  Though *McKinney* is not binding on this Court, that decision also found the statutes plaintiffs sought to enforce – 42 U.S.C. §§ 1437f(o)(8) and 1437d(f) – did not mention the intended beneficiary of the regulation.  *Id*. at \*\*46-49.  The *McKinney* court further concluded that the related regulations could not create a private right of enforcement through § 1983 where the right does not appear explicitly in the statute.  *Id*. at \*53 (*citing Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh*, 382 F.3d 412, 422 (3rd Cir. 2004).

In addition, Defendant AMHA asserts it is entitled to judgment on the pleadings because: (1) it cannot be held liable on the basis of *respondeat superior*; and, (2) the Complaint has failed to allege a policy or practice of the AMHA that was the moving force behind the alleged constitutional violation.  (ECF No. 6.)  AMHA is correct that § 1983 "does not permit a plaintiff to sue a local government entity on the theory of respondeat superior."

> "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (1989)). Rather, the supervisors must have actively engaged in unconstitutional behavior. *Id*. Therefore, liability must lie upon more than a mere right to control employees and cannot rely on simple negligence. *Id*.
>
> \*\*\*
>
> In order for liability to attach to any of [the defendant] supervisors, Plaintiff must prove that they did more than play a passive role in the alleged violations or show mere tacit approval of the goings on. *Id*. Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors. *Id*.; *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995).

*Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006); *see also Monell v. New York*

8

*City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978) ("[§1983] cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor."); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("§ 1983 liability must be based on more than respondeat superior, or the right to control employees.").

Therefore, Plaintiffs cannot maintain an action against AMHA due solely to the alleged negligence of its inspectors, its employees or agents. The Sixth Circuit has explained that a local government entity, such as the AMHA, violates § 1983 where its "official policy or custom actually serves to deprive an individual of his or her constitutional rights." *Id*.

> A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (quoting *Harris*, 489 U.S. at 388 (1989)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id*. at 412; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

*Gregory*, 444 F.3d at 752-753. Therefore, "'municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)); *King v. Marion County Sheriff's Dep't*, 2010 U.S. Dist. LEXIS 64205 (E.D. Tenn. June 28, 2010) ("Plaintiffs must identify the policy, connect the policy to the county itself, and

9

show the particular injury was incurred because of the execution of that policy.")

Unless the AMHA had a policy or practice that resulted in the deprivation of Plaintiffs' rights, count fourteen must be dismissed. Plaintiffs argue that they have indeed alleged such a policy or practice. (ECF No. 12 at 8.) The Complaint, however, simply sets out the applicable HQS and other regulations, and asserts that AMHA failed to comply with them. Plaintiffs have not identified *any* actual custom or policy that was the moving force behind the alleged violations of their federal rights. At best, the Complaint alleges that the AMHA did not have a policy, *i.e.* AMHA was negligent because it failed to enact a policy to enforce the requirements of the regulations. Negligence, or even heightened negligence, however, is insufficient. Plaintiffs allegations are nothing more than legal conclusions and are insufficient under the standards established by the Supreme Court in the *Iqbal* and *Twombly* decisions.

In sum, though Plaintiffs allege serious injuries to their health, they have not alleged any facts capable of showing that those injuries resulted from a cognizable deprivation of any rights, privileges, or immunities secured by the Constitution or federal law. Furthermore, even if the Court – contrary to the law discussed above – presumed such a right, Plaintiffs have failed to allege any policy, practice or custom that caused their injuries. At most, the allegations assert that Plaintiffs might have known of the dangers in their home earlier and/or may not have moved in at all had AMHA conducted adequate inspections. As such, it is recommended that Count Fourteen be dismissed.

**B.  Count Fifteen: State Created Danger**

In Count Fifteen, Plaintiffs allege their rights under the Fifth and Fourteenth Amendments were violated. (ECF No. 1-1.) Though Plaintiffs are not specific in the Complaint, the Court

10

construes this claim as alleging a deprivation of life, liberty, or property, without due process of law. Plaintiffs allege that there was a relationship between them and the AMHA, and that the AMHA created a danger rendering them more vulnerable than had AMHA not acted at all. *Id*.

In *Deshaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the United States Supreme Court held that the Due Process clause does not "require [] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id*. at 195. at 195. "[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *accord Estate of Smithers v. City of Flint*, 602 F.3d 758, 762-763 (6th Cir. 2010).

> A state-created danger claim has three elements:
>
> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (*citing Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)); *accord Estate of Smithers*, 602 F.3d at 763. The Due Process Clause of the Fourteenth Amendment, however, is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney*, 489 U.S. at 195; *accord Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("[S]tate officials may violate the Due Process Clause when their affirmative actions *directly increase* the vulnerability of citizens to danger or otherwise place citizens in harm's way.") (emphasis

11

added).

Again, Plaintiffs rely on the *McKinney* decision.  Therein, the Eastern District Court of Pennsylvania found that the plaintiffs raised a triable issue of fact as to whether the defendant acted affirmatively leaving the plaintiffs more vulnerable to harm.  2010 U.S. Dist. LEXIS 60410 at **64-65.  These "affirmative acts" included the defendant approving the house for rental and making rental payments.  *Id*.  While the facts are similar to those herein, this Court believes that the *McKinney* analysis and its implication herein – that the harm to Plaintiffs increased as a result of AMHA's affirmative actions – is inconsistent with Sixth Circuit law.[4]  Because it can be difficult to determine whether a state official's "behavior amounts to affirmative conduct or not, [the Sixth Circuit has] focused on 'whether [the victim] was safer before the state action than he was after it.'"  *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007) (*quoting Cartwright*, 336 F.3d at 493)).  In *Koulta*, the Sixth Circuit found that defendants had not engaged in an "affirmative act" sufficient to impose liability under a state-created danger theory:

> The estate, to begin, cannot satisfy the "affirmative act" requirement.  Under this inquiry, an officer's failure to act will not satisfy the test but an officer's affirmative acts may satisfy it.  Because it is sometimes difficult to distinguish action from inaction--does, for example, an officer's decision to permit someone he knows to have been drinking to continue driving without administering a breathalyzer test fall on one side of the line or the other?--we have refined the

---

[4] In addition, the *McKinney* court was confronted with a factual situation where it was alleged that the defendant required the plaintiff to continue to live at the rental property for thirty days even after it failed inspection, which, the court explained, could result in a jury finding that the defendant acted with deliberate indifference.  2010 U.S. Dist. LEXIS 60410 at *65.  Herein, there is no such allegation.  In fact, Plaintiffs alleged that the AMHA and/or the Board of Health required the Plaintiffs to relocate after it was determined that the rental property constituted an unhealthy environment.  (ECF No. 1-1 at ¶151.)

12

test.  Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on "whether [the victim] was safer before the state action than he was after it."  *Cartwright*, 336 F.3d at 493.  If the claimant thus cannot identify conduct "by the state which either created or increased the risk" of harm to which Koulta was exposed, *Jones*, 438 F.3d at 690; *see Kallstrom*, 136 F.3d at 1066, our precedents instruct us to consider the officers' "conduct as 'falling on the inaction side of the line.'" *Jones*, 438 F.3d at 692 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)) (brackets omitted); *see also May v. Franklin County Comm'rs*, 437 F.3d 579, 586 (6th Cir. 2006); *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 467 (6th Cir. 2006); *Jackson v. Schultz*, 429 F.3d 586, 591-92 (6th Cir. 2005); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065-66 (6th Cir. 1994).

The risk of harm in this case was that Lucero's drinking and driving would injure someone.  As a matter of law, Koulta's estate has failed to show that the officers "created" or "increased" that risk.  Before they arrived on the scene, Lucero (by her own admission) already had gotten in her car four times to drive after she got a "little buzzed" from the first 40-ounce beer she consumed, JA 165: once to drive to the store to get the second 40-ounce beer; once to drive back to the Offrink's house after buying the beer; once to drive to the house of a friend of Frank Offrink's, all while finishing the second 40-ounce beer, throwing the empty bottle out the window and taking a Paxil; and once more to return to the Offrink's house.  On this record, the officers did not "create" or "increase" the risk that Lucero would drink and drive.  Lucero's proclivity to engage in risky, and illegal, behavior had blossomed long before the officers arrived on the scene.

The officers' failure to administer a breathalyzer test (or otherwise to determine the extent of Lucero's drinking) before ordering her to leave the property may well have been negligent, but it did not "create" or "increase" the danger--of Lucero drinking and driving--that pre-dated their arrival on the scene.  The same is true of the officers' decision to order Lucero to leave the property.  Consistent with the homeowner's understandable request, the officers told Lucero to "go home" when they arrived at the Offrink's home, JA 168, and, when Lucero did not leave after saying she would, they ordered her to leave the property immediately.  The claimant cannot maintain that Lucero never would have been drinking and driving that night but for the officers' conduct--given her acknowledged behavior before they arrived.  And the claimant cannot maintain that Lucero would not have driven to the scene of the accident but for the officers' conduct.  As Lucero acknowledges, the officers told her to "go home" when they first arrived and later ordered her to leave the property.  Neither directive required Lucero to drive home if she lacked the capacity to do so. Nothing prevented her either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.

13

> In the final analysis, Lucero's admitted proclivity to drink and drive that evening placed Koulta (and other people using the roadways) in as much danger before the officers arrived as afterwards. And much as the officers were in a position to head off the tragedy that materialized minutes later, a reality (and memory) that no court decision will eliminate, their conduct was no more an affirmative risk-creating act than the conduct of the officers in *DeShaney* (who returned an abused child to the custody of his abusive father) or *Bukowski* (who returned a mentally disabled girl to the stranger who had been sexually abusing her).

*Koulta*, 477 F.3d at 445-447.

Here, Plaintiffs do not allege that it was AMHA that placed them in the rental property where the harm occurred. To the contrary, the Complaint readily acknowledges that a family approved for a Section 8 voucher "must approach a private landlord to determine the landlord's willingness to participate in the Section 8 Housing Program and may then request AMHA to approve tenancy." (ECF No. 1-1 at ¶40.) The danger that ultimately resulted in Plaintiffs' harm was located on the private property which they chose to rent. Plaintiffs allege that the AMHA either failed to inspect or failed to adequately inspect the property. This allegation, however, amounts to an allegation of *inaction*. There are no allegations in the Complaint that could support a finding that AMHA created the conditions found on the private property in question. Just as the police officers in *Koulta* who failed to prevent a visibly intoxicated person from driving were negligent in their behavior, the alleged failure of AMHA's inspectors to detect the presence of microbiological contaminants or other pollutants cannot rise above negligent behavior. In *Koulta*, the danger was created before the officers arrived at the scene. Herein, the existence of the hazard complained of was not dependent upon any action or, for that matter, inaction by the AMHA. While the AMHA, like the officers in *Koulta*, may have been in a position to head off the injury that later materialized, the alleged conduct simply does not

14

constitute a risk-creating act as a matter of law.

Furthermore, Plaintiffs have not cited a single decision from within the Sixth Circuit finding that a violation of HSQ and other federal regulations is tantamount to a state created danger supporting a § 1983 action. Therefore, accepting as true that the AMHA failed to comply with applicable regulations and conduct timely and/or effective inspections, Plaintiffs fail to state a claim upon which relief could be granted.

**C. Plaintiff's Alternative Request to Amend the Complaint**

Plaintiffs did not file a separate motion to amend their complaint, but merely sought to do so, in the alternative, if their existing complaint was determined to be legally insufficient.[5] (ECF No. 12.) Plaintiffs' brief neither contains additional alleged facts nor offers any explanation that would lead this Court to believe that they could reasonably amend their complaint to cure the aforementioned deficiencies without completely altering the substance of their allegations. As such, an amended complaint based on the same general facts would likely be futile. *See, e.g., Frank v. Dana Corp.*, 2009 U.S. Dist. LEXIS 77030 at *43 (N.D. Ohio Aug. 25, 2009) (where the amendment would be futile, there is no reason to allow it). "[I]t is well settled law that [a] district court may deny a motion to amend if the court concludes that the pleading as amended could not withstand a motion to dismiss." *Martin v. Assoc. Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986) (*citing Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980)); *see also Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

---

[5] Plaintiffs argue that their complaint is sufficient to withstand a motion to dismiss under Ohio's pleading standards, that they filed their action in an Ohio court, and that it was AMHA who removed this action to federal court. (ECF No. 12.)

15

Furthermore, allowing a plaintiff to amend a complaint after it has been determined that it should be dismissed is procedurally improper. "A dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits, and is therefore done with prejudice." *Pratt v. Ventas, Inc.*, 365 F.3d 514, 522 (6th Cir. 2004) (internal quotation marks omitted) (*quoting Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981)); *accord Kachaylo v. Brookfield Twp. Bd. of Trs.*, 2011 U.S. Dist. LEXIS 23598 (N.D. Ohio Mar. 9, 2011) (Lioi, J.). Here, Plaintiffs essentially ask this Court to overrule AMHA's motion, or, if not, to provide them an opportunity to cure the Complaint with the benefit of an opinion from this Court explaining where or how their pleading is deficient. Moreover, Plaintiffs give no indication as to what additional facts they would plead that would allow them to clear the hurdle of a 12(b)(6) motion to dismiss.

Therefore, it is further recommended that Plaintiffs' request to amend the Complaint be DENIED.

**D.    Remaining State Law Claims**

The remainder of Plaintiffs' claims – Counts One through Thirteen – allege violations of state law or state common law claims. A district court can choose to decline to exercise supplemental jurisdiction over state law claims. *See, e.g., Musson Theatrical, Inc. v. Federal Express, Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("After a 12(b)(6) dismissal, there is a ***strong presumption*** in favor of dismissing supplemental claims.") (emphasis added). Therefore, it is recommended that the Court decline jurisdiction over Plaintiffs' state law claims and dismiss the Complaint without prejudice.

16

## V. Conclusion

It is recommended that Defendant AMHA's Motion to Dismiss (ECF No. 6) be GRANTED. Specifically, it is recommended that Plaintiffs' federal claims – Counts Fourteen and Fifteen – be DISMISSED with prejudice and that Plaintiffs' remaining state claims be DISMISSED without prejudice. It is further recommended that Plaintiffs' alternative request to amend the complaint (ECF No. 12) be DENIED as futile.

        /s/ Greg White
        U.S. Magistrate Judge

Date: January 5, 2012

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time may waive the right to appeal the District Court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).** *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**